## Blass *v.* Goodbar.

### Opinion delivered October 15, 1898.

1. FRAUD—PLEDGE OF EXCESSIVE AMOUNT.—The fact that the value of a stock of goods pledged to secure a valid debt is nearly four times greater than the debt raises no presumption of fraud, though it is a circumstance to be considered in determining the good faith of the parties, where the transaction is attacked as fraudulent. (Page 516.)

2. SAME—PLEDGE.—The fact that a pledge was given in part to secure a note on which the pledgee was merely an indorser for the pledgeor, and that the note was further secured by a mortgage, will not render the pledge fraudulent. (Page 518.)

3. ASSIGNMENT FOR CREDITORS—PLEDGE.—A conveyance by an insolvent firm of a stock of goods by way of pledge to a creditor will not constitute an assignment for the benefit of creditors where there was no agreement that such creditor should act as trustee for other creditors. (Page 519.)

Appeal from Faulkner Chancery Court.

THOMAS B. MARTIN, Chancellor.

STATEMENT BY THE COURT.

The insolvent firm of L. B. Griffing & Co., on October 17, 1895, executed the following pledge: "Gus Blass & Co.—We hereby pledge to you the goods and property in our dry goods store at Conway, this day delivered into your possession, to hold in pawn for the account, ($3,211.32) thirty-two hundred and eleven dollars and thirty-two cents, which we owe you, due and to become due, and to hold further as indemnity for your liability as our indorsers on a note for ($1,500) fifteen hundred dollars, given by us to E. E. Slade, dated August 16, 1894, bearing 10 per cent. interest from date, and due January 1, 1896, and now held, as we understand, by the Bank of Conway. If you realize your money out of the goods and property before all the account falls due, your are to give us an equitable discount on amounts you realize before maturity, at the rate of 10 per cent. per annum.　　　　L. B. GRIFFING & Co. "Attest: J. D. COLLIER.

"Dated at Conway, Ark., Oct. 17, 1895."

This pledge and the property mentioned therein were immediately and simultaneously delivered to Gus Blass & Co. All except the last item mentioned in the pledge was past due when the pledge was executed.

On the same night (for the pledge to Blass & Co. was executed at night) after the pledge and property described therein had been delivered to Blass & Co., L. B. Griffing and J. D. Collier, partners as L. B. Griffing & Co., executed four several deeds of trust, with W. W. Martin named therein as trustee, to secure certain debts, which they owed other creditors whom they wished to prefer. These trust deeds were all substantially in the same form, as follows: "We, L. B. Griffing and J. D. Collier, partners as L. B. Griffing & Co., hereby bargain, sell and mortgage to W. W. Martin, trustee for Jesse E. Martin, our entire stock of groceries and other personal property which we have in the corner house, known as the J. E. Martin house, in Conway, Arkansas, and also the stock of dry doods and other property which we have this day pledged to Gus Blass & Co.,

in the Hill, Fontaine & Co. building, in Conway, Arkansas. This mortgage is given subject to the rights of Gus Blass & Co. in the stock of dry goods, and subject also to a prior mortgage this day given to W. W. Martin, trustee for the Bank of Conway. To have and to hold as security for two notes aggregating $1,400, given, one for $1,100 and one for $300, during the year 1895, by us to J. E. Martin, said notes being subject to a credit by a contra account against J. E. Martin, as shown by our books, for about $160.

"Witness our hands, this 17th day of October, 1895.

"L. B. GRIFFING.

"J. D. COLLIER."

The *cestuis que trust* and amounts respectively secured by these several trust deeds were as follows: J. E. Martin whom the firm owed $1,400; one Carter, a note of $500, on which the trustee, Martin, was indorser; the Bank of Conway, a note held by it, which Griffing & Co. had executed to one Slade for $1,500 with interest, on which note Gus Blass & Co. were indorsers, being the same note mentioned *supra*, in the pledge to them; and to Zettleton Manufacturing Co., a debt due it of—— dollars.

These several trust deeds were delivered to the trustee about six o'clock of the morning after the night they were executed; also, at the same time, the contents of said grocery store named in said deed were delivered to the trustee, who took possession of same. These trust deeds were filed for record at 6:30 o'clock, a. m., on the same day and after their delivery. A few minutes after these trust deeds were filed for record, two or three mortgages were executed to other creditors, among them Mrs. Griffing, by Griffing & Co., covering the same property included in the pledge and deeds of trust, and also a small amount of property not embraced therein. But these mortgagees did not obtain possession of any of the property named in the pledge or deeds of trust *supra*. As indicated in the trust deeds, Griffing & Co. had two stores, a dry goods store and a grocery store, in separate buildings, and across the street from each other. On October 17, 1895, after the pledge and deeds of trust had been delivered, and possession of the property therein mentioned had been taken, respectively, by the pledgees

33

and the trustee, and after the trust deeds had been recorded, appellees, Goodbar & Co., brought suit by attachment, and had same levied upon the said property in the two stores, the sheriff taking possession of said property. On the next day, the 18th, trustee Martin brought this suit to foreclose one of these deeds of trust, and to have the other deeds of trust and mortgages and the pledge to Gus Blass & Co. foreclosed. Griffing & Co., Gus Blass & Co. and other parties, mortgagees, as well as all the attaching creditors, were defendants in this suit to foreclose, and entered their appearance, and agreed to the appointment of a receiver. H. B. Ingram was appointed such receiver, and he qualified, and took possession of the goods, as such receiver, and was directed to sell same at public auction on November 16, 1895. On the 15th November, 1895, Gus Blass & Co., under the terms of a certain compromise agreed upon by the parties, by which all the creditors except Goodbar & Co. were eliminated from the case, were permitted to enter into bond with said Goodbar & Co., which should stand in lieu of the goods attached, and to take possession of the said goods. That bond is as follows: "Whereas, Goodbar & Co. have a suit pending in the circuit court of Faulkner county, Arkansas, against L. B. Griffing and J. D. Collier, composing the firm of L. B. Griffing & Co., for $518.30, in which suit an attachment was issued and levied upon certain goods and property, which goods and property were afterwards placed in the hands of a receiver of the Faulkner chancery court in the case of W. W. Martin, trustee, and others, plaintiffs, against L. B. Griffing & Co. and other defendants. Now, if said attachment shall be sustained, and if it shall be finally adjudged that said Goodbar & Co. are entitled to have their money paid out of the assets of said L. B. Griffing & Co. now in the hands of the receiver, and that the attachment of Goodbar & Co. is a lien on said property superior to that of Gus Blass & Co., and to the lien ,of those creditors of said L. B. Griffing & Co., to whom they gave mortgages on said property, then we, the undersigned, agree and bind ourselves to pay said Goodbar & Co. the full amount of their said claim, with interest and costs of suit; otherwise this obligation shall be null

and void. November 15, 1895. L. B. Griffing. J. D. Collier. Gus Blass & Co."

Griffing & Co. traversed the attachment pending in the circuit court, and Gus Blass & Co. intervened therein, and, by consent, the attachment issue in the cause was transferred to equity, and there consolidated with the present suit. Gus Blass & Co. filed in this consolidated case in chancery their answer, interplea and cross-bill, in which they set out all the facts *supra*, and claimed title to the goods under receiver's sale to them, approved by the chancellor. They adopted the traversing affidavit of Griffing & Co.; denied any fraud on the part of Griffing & Co., or any knowledge of it on their part, or on the part of the trustee or creditors in the trust deeds; and denied any grounds of attachment, or that the property was subject thereto. Appellees filed an answer, setting up that the pledge to Blass & Co. and the mortgages to W. W. Martin, trustee, and the other mortgages were fraudulently made to secure fictitious debts, and claiming a lien on the goods by attachment, and asking to have same enforced. The decree was in favor of appellees sustaining the attachment, and declaring the lien created thereby superior to the lien of Gus Blass & Co.

*W. S. & Farrar L. McCain*, for appellants.

This case is not analogous to 52 Ark. 30, and the facts do not warrant the court's decision that there was an attempted assignment. Appellee had a right to take all the security he could get, so long as he acted solely with the intent to secure his own debt, even though he knew his debter was intending to hinder other creditors. 61 Ark. 442. Pawned or pledged personal property is not liable to attachment in an action against the pledgeor. 42 Ark. 236; Jones, Chat. Mortg. § 555.

*P. H. Prince*, for appellees.

In deciding whether or not a conveyance operates as an attempted assignment, the test is, was it the intention of the parties to divest the debtor of his title and appropriate the property to raise a fund to pay debts? 58 Ark. 293; 52 Ark. 30; 53 Ark. 101; 60 Ark. 26. The disproportion of the debt to the security taken stamp the transfer as a fraud. 23 Ark. 258; 56 Ark. 414. Appellees never agreed to any compromise

which now estops them to object to the fraud in the transfer. Actual notice to a purchaser of the vendor's fraudulent intent is not necessary where the circumstances are or should be sufficient to put him on his guard.   50 Ark. 320; 55 Ark. 582; 32 Ark. 251; 32 Fed. 310.

WOOD, J., (after stating the facts).   First.The most painstaking examination of this record fails to discover any fraud upon the part of Gus Blass & Co., either actual or constructive. The matters pressed here for actual fraud are all consistent with honest conduct, and only comport with the efforts which we would naturally expect an honest and vigilant creditor to put forth to collect his debt.   The *bona fides* of the Blass claim is nowhere called in question.   That being true, the other matters urged as evidence of fraud do not prove it.   It is insisted, for instance, that the time of night the goods were delivered to Gus Blass & Co.; the character of the instrument that evidenced the transfer; the disparity between the amount of the debt and the goods pledged for its payment; the fact that the pledge included $1,708.75, for which Blass & Co. were only indorsers; and that, after all the goods had been attached, Gus Blass & Co. "took the lead," as counsel express it, in getting up a compromise, at 45 cents on the dollar, with the attaching creditors, except Goodbar & Co., by the terms of which Blass & Co. were first to be paid in full, and then the mortgagees, and then, if any, balance to go to Griffing & Co.—all these things, it is urged, when taken in connection with all the circumstances, bear the earmarks of actual fraud upon the part of Blass & Co.   But not so.   Undoubtedly Griffing & Co. in the impending financial collapse desired to have Gus Blass & Co. fully protected, and hence notified them of the situation, and they, as prudent creditors, 'stood not upon the order of their going,' but made haste to reach their debtors, and to secure their own claim, and indemnify themselves against certain loss upon that for which they were sureties.   They adopted the most expeditious and efficient means and methods for accomplishing their purpose.   That is all there is about the transfer being at night, and being evidenced by an unrecorded pledge with delivery of possession, instead of by a recorded mortgage.

The transfer of some nineteen thousand dollars' worth of

goods in pledge to secure the payment of an amount approximating only $5,000 is not *prima facie* or *per se* fraudulent. It is a circumstance to be considered in determining the good faith of the parties to the transaction. Inasmuch as a pledge, and also a mortgage of property, removes the property so pledged or mortgaged beyond the reach of other creditors under the ordinary process of execution, the placing under pledge or mortgage of an amount grossly in excess of what would be necessary, under any and all contingencies, to meet the debt intended to be secured might tend to show a purpose, upon the part of the debtor making and the creditor receiving such a pledge or mortgage, to hinder and delay other creditors in the collection of their debts. Therefore, where a fraudulent disposition of property is charged, it is always proper to consider the question of excess, in connection with other circumstances, to determine whether the debtor, in making the conveyance to one creditor, was seeking some undue advantage for himself against other creditors, in which the favored creditor was assisting him. *Bennett* v. *Union Bank*, 5 Humphreys, 612–617; *Burgin* v. *Burgin*, 1 Ired. L. (N. C.) 453–459; *Ford* v. *Williams*, 13 N. Y. 577; S. C. 67 Am. Dec. 83; Bump, Fraud. Conv. § 58; Wait, Fraud. Conv. § 238a, and authorities cited. The fact that the amount pledged greatly exceeded the debt does not show any fraud in the present instance. The pledge of the dry goods to Gus Blass & Co. immediately transferred the possession of the same to them, and, as to said goods, immediately took it out of the power of Griffing & Co. to use them any longer for their own profit. The language of the pledge indicates that Gus Blass & Co. were to proceed immediately to use the goods in pawn for the payment of their debt, and it is not shown or even pretended that, during the short interval in which Gus Blass & Co. had the possession of the goods, they used or attempted to use and dispose of same in any manner detrimental to or inconsistent with the rights of other creditors. It is not shown that they sought to collect any more than their own debt, or in any manner to assist the debtor in gathering unto himself forbidden gains. Likewise it may be said of the proceeding under the trust deeds and mortgages. The effort under these was simply to collect in the legal way the debts which had been provided for in said deeds.

The fact that $1,708.75 was included in the pledge for which Blass & Co. were only liable as indorsers was not evidence of a fraudulent purpose in taking the pledge, and could not render the same nugatory and void on that account. Griffing & Co. were notoriously and hopelessly insolvent. It was only a matter of time, and of a very short time at that, when Blass & Co. would have the note to pay. They only purported, in the pledge, to indemnify themselves in the event of their having the note to pay. It was a perfectly legitimate transaction, indicating foresight rather than fraud. The fact that the same amount was also included in a mortgage to secure the Bank of Conway could not affect Gus Blass & Co. with fraud, even if it had been any evidence of a fraudulent purpose upon the part of Griffing Co. It remains that there could, in law, properly be but one satisfaction of the note, and there was no possible chance for any creditor to be defrauded because Gus Blass & Co. had provided indemnity for themselves in case of its payment. For, the moment Blass & Co., the first preferred creditors, paid off the note, that would extinguish the note, and *eo instanti* the mortgage given to the bank to secure it. So far as the compromise is concerned, the creditors are supposed to be dealing with each other "at arm's length." We see nothing that Blass & Co. might have done in connection therewith that could be regarded as a badge of fraud on their part. Certainly, no creditor was forced to accept any compromise, and the one complaining here has not done so as to the paying off of its debt for 45 cents on the dollar. The other provisions of the compromise, by which Blass & Co. for a certain price bought the goods from the receiver and executed to appellees a bond which was to take the place of the attached property, appellees assented to. We fail to comprehend how any kindly offices that might be extended by a favored creditor to his debtor who had preferred him, in bringing about a compromise with other creditors who had not been preferred, could be regarded as even tending to show actual fraud upon the part of the preferred creditor in the transfer of property which had been previously made to him. This is the most that could be said of the compromise.

The suggestion or contention that the pledge of Blass &

Co. may be tainted with fraud, for the reason that Griffing & Co. a short time thereafter executed to Mrs. Griffing a mortgage which was indeed fraudulent, is an obvious *non sequitur*; for a creditor may know, at the time he takes his conveyance or transfer, that his debtor has an intent to defraud other creditors, but that does not prevent him from collecting his own debt, and, so long as he does not wilfully or intentionally, or by gross and inexcusable carelessness, assist his debtor to defraud another—his sole purpose being to collect his own debt—any transfer or conveyance made with that end in view will be upheld.

Second. Was there constructive fraud? It is insisted that the pledge to Gus Blass & Co. and the deeds to Martin, trustee, and the other mortgages, taken altogether, constitute an assignment for the benefit of creditors. We do not so construe them. It would be doing violence to the plain language and tenor of the instruments themselves to so construe them. They lack essential elements for an assignment. "Conveyances directly to creditors, in payment or by way of security for their own debts solely," says Mr. Burrill, "are not generally assignments for the benefit of creditors." Burrill, Assignments, § 3. The pledge to Gus Blass & Co. was made to them direct, no trustee was named or contemplated, and the transfer was to enable them solely to pay off their own debt. After they were paid, the property remaining was subject to various other mortgages and deeds of trust, to be sure, but there was no stipulation in the pledge, nor was any understanding otherwise shown, that Gus Blass & Co., after they were paid, should hold and manage the balance of the property as a trustee to raise money to pay other debts. The doctrine "that one or more instruments, in whatever form or by whatsoever name, when executed with the intention of having them operate as an assignment, and with the intention of granting the property conveyed absolutely to the trustee to raise a fund to pay debts, shall constitute an assignment," was announced under the peculiar facts in the case of *Richmond* v. *Mississippi Mills*, 52 Ark. 31. In *Fecheimer* v. *Robertson*, 53 Ark. 101, this court, through the same learned judge, shows that the case was not to be extended to cover cases not brought strictly within the facts upon which it was decided. Speaking of *Richmond* v. *Missis-*

*sippi Mills, supra,* Judge Sandels says: "Richmond's agreement that Taylor should assume charge for himself and twelve others not represented or consulted, and that a man suggested by Richmond should be manager for all, together with many other circumstances indicating the intention of the parties, made it clear that the transaction in that case was an assignment." See other cases cited in *Fecheimer* v. *Robertson, supra.* The facts of the case under consideration are altogether different from those of *Richmond* v. *Mississippi Mills,* and bear a nearer resemblance to the facts in *Fecheimer* v. *Robertson.* Certain it is that, so far as Gus Blass & Co. were concerned, they were trustees for nobody, acted for themselves, and themselves alone, and not in conjunction with any other creditor. Nor was there any concert of action among any of the various creditors.

It appears, from the terms of the compromise to which Goodbar & Co. assented, and the provisions of the bond filed in pursuance thereof, that said bond was to stand in lieu of the attached property, if Goodbar & Co. should establish "a lien on said property superior to that of Gus Blass & Co. and to the lien of those creditors of said L. B. Griffing & Co., to whom they gave mortgages on said property." Conceding that the attachment should be sustained, we have been unable to find warrant for the ruling of the learned chancellor that the lien created by the attachment in favor of Goodbar & Co., appellees, is superior to that of Gus Blass & Co.

As to the ruling of the court sustaining the attachment against Griffing & Co., it suffices to say that there is evidence to support the finding of the chancellor in that particular.

Reversed and remanded, with directions to enter a decree in favor of Gus Blass & Co. for the proceeds of the attached property, and in favor of Goodbar & Co. for costs in the attachment against L. B. Griffing & Co., and for such other and further proceedings as may not be inconsistent with this opinion.